UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(Eastern Division)

| | |
|---|---|
| In re:<br><br>INSPIRATION BIOPHARMACEUTICALS, INC.,<br>                Debtor. | Chapter 11<br><br>Case No. 12- 18687 |

AFFIDAVIT OF JOHN P. BUTLER IN SUPPORT OF
FIRST DAY MOTIONS AND APPLICATIONS

I, John P. Butler declare as follows:

1. I am the Chief Executive Officer of Inspiration Biopharmaceuticals, Inc. (the "Debtor") and have served in this capacity for approximately one year. I am familiar with the business and affairs of the Debtor.

2. I submit this declaration (the "Declaration") to support the Debtor's petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") filed on October 30, 2012 (the "Petition Date") in this Chapter 11 case and the relief in the form of the motions and applications that the Debtor has simultaneously requested of the Court.

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, upon information supplied to me by other members of the Debtor's management or professionals, upon information learned from my review of relevant documents, or upon my opinion based upon my experience and knowledge of the Debtor's operations and financial conditions. If called as a witness, I would testify to the facts set forth in this Declaration. Unless otherwise indicated, all financial information contained herein is presented on an unaudited basis. The Debtor has not yet prepared its schedules and statement of financial

affairs, and the completion of such schedules and statements may result in modifications to any amounts or descriptions set forth herein. I am authorized to submit this Declaration.

4. Section I of this affidavit provides a brief background for the Debtor. Section II provides background respecting the Debtor's relationship with its largest creditor, Ipsen Pharma, S.A.S. ("Ipsen"). Section III provides information respecting the assets of the Debtor as well as its debt and capital structure. Section IV addresses the precipitating factors for the bankruptcy filing and the objectives of the Chapter 11 case. Section V provides a summary of the motions being filed with this affidavit, and Section VI identifies other pleadings anticipated to be filed in the first week of the case.

## I. THE DEBTOR

5. The Debtor commenced this case by filing a voluntary Chapter 11 petition on October 30, 2012.

6. The Debtor continues to operate as a debtor-in-possession pursuant to 11 U.S.C. §§1107, 1108.

7. The Debtor, which was founded in 2006, is a Delaware corporation with its headquarters located at One Kendall Square in Cambridge, Massachusetts.

8. The Debtor operates a biopharmaceutical company focused principally on the treatment of hemophilia. The Debtor was founded by John R. Taylor, Jr., its Chairman of the Board of Directors, and Scott Martin, both of whom have sons with hemophilia. Mr. Taylor and Mr. Martin were committed to making a difference for people living with this disease by broadening treatment choices, expanding access to care, and advancing innovative therapies.

9. Hemophilia is a genetic disorder resulting in low levels of a clotting factor protein that is essential for blood clotting. Without the necessary levels of the clotting factor protein,

2

individuals are at risk for excessive internal bleeding, which may occur following an injury or surgery. These bleeds can result in severe joint and organ damage.

10. There are two types of congenital hemophilia: hemophilia A, which is caused by a deficiency of factor VIII (80% of the hemophilia population has hemophilia A); and hemophilia B, which is caused by a deficiency of factor IX. Another type of hemophilia is acquired hemophilia. Acquired hemophilia is rare, though possibly life-threatening, and caused by the development of inhibitors against blood coagulation factors. Unlike congenital hemophilia, acquired hemophilia is typically found in older adults, and occurs in both men and women. Also, the pattern of bleeding seen in acquired hemophilia is different from that observed in the more common congenital form. In acquired hemophilia, people typically bleed into the skin, muscles, and soft tissues, as opposed to bleeding into joints, which is more typical in congenital hemophilia.

11. Approximately 400,000 people globally are believed to be affected by hemophilia, with less than one-third obtaining necessary treatment. The primary treatment for hemophilia consists of clotting factor replacement therapies, including products made from human blood plasma (plasma-derived products) and products made using genetically engineered cells that carry a human factor gene (recombinant products). Therapy for hemophilia can either be provided on demand, to control a bleeding episode, or prophylactically, to avoid spontaneous bleeding episodes. There is a growing amount of data to suggest that prophylactic treatment of hemophilia can prevent permanent joint damage and allow people to live more normal, productive lives.

12. The Debtor has two proprietary product candidates for hemophilia in advanced clinical development: (i) recombinant factor IX, IB1001 ("FIX" or "IB1001"), which is intended

to treat and prevent bleeding in people with hemophilia B; and (ii) recombinant porcine factor VIII, OBI-1 ("OBI-1"), which is intended to treat people with hemophilia A with inhibitors as well as acquired hemophilia (collectively, the "Products"). Approval of IB1001, which is anticipated in the United States and the European Union as early as 2013, would provide the first new choice in recombinant therapy available for individuals with hemophilia B in more than 15 years. Approval of OBI-1, which is also anticipated as early as 2013, would provide the first and only recombinant porcine factor VIII replacement therapy for individuals with acquired hemophilia. Approval to use this Product in congenital hemophilia A with inhibitors would follow completion of an ongoing study in this disease. The Products have not yet received regulatory approval and cannot be marketed. In addition, Debtor has two product candidates for hemophilia in pre-clinical development: recombinant factor VIIa and recombinant factor VIII.

13. As of July 2012, the Debtor had sixty-six (66) employees. As a result of two reductions in force, the Debtor has reduced its employee level to eighteen (18). The Debtor's remaining employees consist of a highly experienced team with significant background in hemophilia and other rare diseases and who are essential to implementing the reorganization objectives. Notably, almost all of the members of the existing management team have all joined the Debtor within the past year. The Debtor's employees primarily serve in the following roles: administrative support; legal and accounting; product development; and regulatory compliance. The Debtor has engaged CMC Biologics, Inc. ("CMC") to manufacture IB1001 at its facility in Bothell, Washington. OBI-1 is manufactured by Biomeasure, Inc., an affiliate of Ipsen, at its facility in Milford, Massachusetts.

## II. DEBTOR'S RELATIONSHIP WITH IPSEN PHARMA S.A.S.

14.     The Debtor has extensive business relationships with Ipsen, a French company that is engaged in specialty healthcare with a longstanding history in therapeutics. As is more fully discussed below, Ipsen and its affiliates have secured and unsecured claims against the Debtor and hold equity interests in the Debtor. Ipsen also provides manufacturing support for the development of OBI-1, and controls three seats on the Debtor's nine member Board of Directors.

15.     On or about January 20, 2010, Ipsen and the Debtor entered into the OBI-1 License/Sublicense, Development, and Commercialization Agreement (the "Original OBI-1 License Agreement"), pursuant to which Ipsen granted the Debtor certain exclusive licenses and sublicenses to develop, obtain approval for, and commercialize the OBI-1 product worldwide (the "OBI-1 License"). In consideration for the OBI-1 License, the Debtor agreed to pay Ipsen certain royalties on future sales of the OBI-1 product and issued a senior convertible note to Ipsen in the original principal amount of $50,000,000 (the "Initial Note").

16.     On or about January 20, 2010, the Debtor and Ipsen entered into a Series C Stock Purchase and Investment and Development Agreement (the "Investment Agreement") pursuant to which the parties agreed to collaborate in the development and commercialization of certain product candidates and whereby: (a) Ipsen agreed to purchase shares of Series C preferred stock in the Debtor; (b) Ipsen agreed to make a series of advances to the Debtor on a phased-in basis contingent upon the Debtor's achievement of certain regulatory milestones, as further set forth below[1]; and (c) Ipsen was granted the right to appoint one member, and to jointly appoint one member with the Debtor's founding stockholders, to the Debtor's then seven member Board of

---

[1] On or about September 26, 2011, the Investment Agreement was amended to extend the deadlines for the Debtor to achieve the clinical development milestones for its Products.

5

Directors. In return for the advances made by Ipsen, the Debtor executed and delivered the following promissory notes (the "Milestone Notes") to Ipsen:

 (i) a First Senior Convertible Promissory Note dated November 19, 2010 in the original principal amount of $50,000,000, as amended on August 16, 2012;

 (ii) a Second Senior Convertible Promissory Note dated November 23, 2011 in the original principal amount of $25,000,000, as amended on August 16, 2012;

 (iii) a Third Senior Convertible Promissory Note dated September 29, 2011 in the original principal amount of $35,000,000, as amended on August 16, 2012; and

 (iv) a Fourth Senior Convertible Promissory Note dated April 12, 2012 in the original principal amount of $35,000,000, as amended on August 16, 2012.

17. On or about January 20, 2010, the Debtor entered into a Security Agreement with Ipsen.[2] Pursuant to the Security Agreement, the Debtor granted a senior lien to Ipsen on substantially all of its existing and future assets to secure repayment of the Debtor's obligations to Ipsen, including those arising under the Initial Note and the Milestone Notes.

18. On or about August 29, 2011, the Debtor and Ipsen entered into a European Commercialization Collaboration Agreement. (the "EU Commercialization Agreement"). Pursuant to the EU Commercialization Agreement, the Debtor granted Ipsen rights to promote and sell IB1001 and OBI-1 in Europe. In exchange for Ipsen's commercialization services, the

---

[2] On or about July 9, 2012, the Security Agreement was amended and restated. On or about August 16, 2012, the Debtor and Ipsen entered into a First Amendment to the Amended and Restated Security Agreement.

6

Debtor agreed to pay (i) prior to commercial launch of the Products, Ipsen's costs plus 15% and (ii) after commercial launch of the Products, Ipsen's costs plus a 5% royalty on sales of the Products. Ipsen established a separate business unit, Inspiration Europe, to perform this function.

19. On or about July 9, 2010, the Debtor and Biomeasure Incorporated (including its affiliates) (collectively, "Biomeasure") entered into a Master Services Agreement (the "MSA"). Biomeasure Incorporated is an affiliate of Ipsen. Pursuant to the MSA, Biomeasure agreed to provide necessary services to manufacture OBI-1 for a period of approximately ten years. Ipsen asserts that approximately $16,785,000 is owed for services rendered in accordance with the MSA. The Amended OBI-1 License Agreement entered into by the Debtor and Ipsen, discussed below, provided that the parties would negotiate a Commercial Supply Agreement for the manufacture of OBI-1, containing commercially reasonable terms and conditions, by the end of October 2012. This Commercial Supply Agreement has not yet been executed.

20. On or about July 12, 2012, Ipsen advanced the sum of $15,000,000 (the "Bridge Loan") to the Debtor. In return, the Debtor executed and delivered a Senior Secured Note.

21. As an inducement to Ipsen making the Bridge Loan, the Debtor and certain other investors agreed to terminate the Third Amended and Restated Stockholders Agreement dated September 26, 2011 and to enter into a new Stockholders Agreement dated August 16, 2012 (the "New Stockholders Agreement"). In addition, the Debtor agreed to provide Ipsen with commercialization rights to OBI-1 and IB1001 in certain territories, as set forth in the Amended OBI-1 License Agreement and IB1001 License Agreement discussed below.

22. The New Stockholders Agreement, among other things: (i) obligated Ipsen to invest at least $20,000,000 in the Debtor in connection with a Qualified Financing (meaning a

debt or equity financing of at least $50,000,000); (ii) obligated the Debtor to issue stock warrant to Ipsen, in consideration for a one-time, non-refundable payment of $7,500,000, if a Qualified Financing was not completed by August 31, 2012, which stock warrant if exercised would provide Ipsen with majority ownership of the Debtor, and (iii) granted Ipsen additional governance rights in the Debtor if a Qualified Financing was not secured by September 30, 2012. Conversely, if a Qualified Financing was completed in this timeframe, Ipsen would relinquish certain rights such as its right to acquire the Debtor.

23.    As a further inducement for the Bridge Loan, the Debtor agreed to grant rights to Ipsen to develop and commercialize the IB1001 and OBI-1 products in various countries around the world (the "Ipsen Territory"). Specifically, on or about August 16, 2012, the Debtor entered into (1) the IB1001 License/Sublicense, Development and Commercialization Agreement (the "IB1001 License Agreement") with Ipsen, whereby Ipsen was granted the right to develop and exclusively commercialize IB1001 in the Ipsen Territory, and (2) the OBI-1 License/Sublicense, Development and Commercialization Agreement (the "Amended OBI-1 License Agreement"), whereby Ipsen regained the right to co-develop and exclusively commercialize the OBI-1 product in the Ipsen Territory (rights which had initially been granted by Ipsen to the Debtor pursuant to the Original OBI-1 License Agreement). In exchange for providing these rights, Ipsen paid the Debtor an upfront milestone payment of $15,000,000 and converted the $15,000,000 Bridge Loan into an upfront payment for the Products and agreed to pay the Debtor contingent payments upon achievement of certain development and commercial milestones, as well as a royalty on sales of both Products. Given this new commercial arrangement, the EU Commercialization Agreement was terminated.

## III. ASSETS, LIABILITIES, AND CAPITAL STRUCTURE OF THE DEBTOR

24. As of the Petition Date, the Debtor had cash of approximately $80,000. The Debtor's principal assets are its patents, trademarks, and product candidates. The patents for the OBI-1 product are in-licensed from Ipsen, some patents are owned by Ipsen and others are licensed to Ipsen from Emory University. The patents for the IB1001 product are either owned by the Debtor or in-licensed from the University of North Carolina. The trademarks are all owned by the Debtor.

25. As of the Petition Date, Ipsen asserts a claim in the original principal amount of $195,000,000, as well as accrued and unpaid interest, costs, and fees, on account of the Initial Note and the Milestone Notes, which claim is secured by a lien upon substantially all of the Debtor's existing and future assets. Biomeasure asserts to be owed approximately $16,785,000 for clinical product manufactured on behalf of the Debtor. Ipsen is owed approximately $2,600,000 for services provided under the EU Commercialization Agreement. The aggregate unsecured indebtedness to Ipsen and its affiliates is therefore asserted to be approximately $19,400,000.

26. The remaining unsecured indebtedness to non-Ipsen entities is estimated to be approximately $12,000,000. This indebtedness includes amounts owed to CMC in connection with the manufacture of FIX, other providers of research, clinical and other services, as well as professional service firms.

27. The Debtor has issued and outstanding stock as follows: i) the founders and angel investors own 11,905,000 shares of common stock, representing 15.7% of the Debtor's capital[3]; ii) the founders own 2,705,066 shares of Series A preferred stock, representing 3.6% of the

---

[3] All amounts are calculated on an as-converted, or fully diluted, basis with respect to convertible notes.

Debtor's capital; iii) the founders and angel investors own 4,357,000 shares of Series B preferred stock, representing 5.7% of the Debtor's capital; iv) Ipsen owns 8,211,000 shares of Series C preferred stock, representing 10.8% of the Debtor's capital; v) Ipsen owns 10,160,000 shares of Series C stock in the form of convertible notes, representing 13.4% of the Debtor's capital on an as-converted basis; vi) Celtic Pharma FIX Venture Ltd. owns 10,839,000 shares of Series D preferred stock, representing 14.3% of the Debtor's capital; vii) Ipsen owns 11,764,000 shares of Series E stock in the form of convertible notes, representing 15.5% of the Debtor's capital on an as-converted basis; and viii) the option pool (which included vested, unvested, exercised, and not yet granted options to acquire common stock in the Debtor) has 15,875,355 shares of common stock representing 20.9% of the Debtor's capital.

## IV. PRECIPITATING CAUSE OF BANKRUPTCY FILING AND OBJECTIVES OF THE PROCEEDING

28.    Prior to the Petition Date, the Debtor was in arrears with CMC for services rendered in connection with the manufacture of the FIX product for amounts in excess of $5,000,000. On or about October 15, 2012, CMC delivered a letter to the Debtor alleging that a default had occurred under the contract and that the contract would terminate if the arrearage was not cured within ten (10) business days. This deadline was extended by agreement of the parties to November 2, 2012.

29.    Also, in June 2012, on the day before the Debtor began its negotiations with Ipsen of the agreements ultimately executed on August 16, 2012, the United States Food and Drug Administration imposed a clinical hold on IB1001. Consequently, virtually all administration of IB1001 to clinical trial patients was halted. The clinical hold was due to higher than normal levels of host cell protein in IB1001. A manufacturing process change to remedy this issue has

since been developed. Given the clinical hold, and the Debtor's high monthly cash burn due to the payments owed to CMC and Biomeasure, the Debtor was unable to secure a Qualified Financing on or before September 30, 2012 as contemplated under the New Stockholders Agreement.

30. The Debtor continued its negotiations with Ipsen with respect to financing requirements and restructuring alternatives. Ipsen expressed a willingness to provide further financing to the Debtor on a senior secured basis and only for a limited period of time necessary to conduct an orderly sale of the Debtor's assets. Given its myriad of financial challenges, the Debtor concluded that the financing and sale would best be accomplished in the context of a Chapter 11 case.

31. Ipsen has agreed to contribute its assets relating to the Products to ensure that a prospective buyer can acquire worldwide rights to the licenses and patents relating to the Products, thereby enhancing the marketability of the assets. Ipsen has further agreed to make some of the sale proceeds available for distribution to unsecured creditors and equityholders, even if the sale proceeds are insufficient to satisfy Ipsen's secured claim in full.

32. The Debtor believes that the foregoing measures will best serve the objectives of achieving an orderly sale of the Debtor's assets within a reasonable time frame and maximizing the recovery from the Debtor's assets for the benefit of creditors and equityholders.

## V.    SUMMARY OF FIRST DAY MOTIONS

### A.    Motion to Approve DIP Financing

33. The Debtor intends to finance its operations during the Chapter 11 case with a debtor-in-possession financing facility with Ipsen. Ipsen has agreed to loan the Debtor on a postpetition, senior secured and superpriority administrative basis up to $18,300,000 to fund

operations for a period of approximately (90) days to allow for an orderly sale of all or substantially all of the Debtor's assets (the "DIP Credit Facility"). The Debtor has filed herewith a motion to approve the DIP Credit Facility, the essential terms of which are as follows:

**Interest:** Nine and five-tenths percent (9.5%) per annum. During the continuance of an Event of Default, advances, interest, fees and other amounts due will bear interest at a rate of twelve and five-tenths percent (12.5%) per annum.

**Termination Date:** Unless otherwise extended by agreement, the DIP Credit Facility will end on the earlier of 120 days after the Petition Date or upon the occurrence of an Event of Default and expiration of any applicable grace period.

**Availability:** An Initial Borrowing of $600,000 and with Additional Borrowings aggregating to $18,300,000, plus any amounts needed to fund the Carve Out in the event of a termination before a sale of the assets.

**Security:** Ipsen shall be granted a first priority perfected security interest in all assets of the Debtor subject only to valid perfected and nonavoidable liens of third parties in existence at the time of filing, excluding the Ipsen liens. Ipsen shall also have an allowed superpriority administrative expense for all amounts advanced under the DIP Credit Facility, except for the Carve Out and except for avoidance actions.

**Carve Out:** (i) the payment of fees pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c), and (ii) the payment of accrued administrative expenses through the Termination Date or the Maturity Date, including unpaid professional fees for services rendered and expenses incurred by the professionals to the Debtor, and any Committee (excluding any incurred and unpaid professional fees and expenses of any of the lenders payable pursuant to the Interim Order), severance, unpaid wages and claims for postpetition goods and services incurred but unpaid, each in an amount not to exceed the aggregate unpaid amount for such item set forth in the Budget that had accrued or been incurred through the Termination Declaration Date and (iii) the amount of $100,000 to the Debtor for post Termination Date or Maturity Date payment of costs and expenses including but not limited to professional fees. The Carve Out shall be funded by Ipsen and added to the DIP Credit Facility but in no event shall such amounts exceed the commitment amount under the DIP Credit Facility.

**Events of Default:** Include failure to make payments when due, noncompliance with covenants, breaches of representations and warranties, failure to satisfy or stay execution of judgments in excess of specified amounts, existence of materially adverse changes, conversion or dismissal of the case or the appointment of a Chapter 11 trustee.

**Super Priority and Administrative Status:** Subject to the Carve Out and excluding proceeds from avoidance actions under Chapter 5 of the Bankruptcy Code, Ipsen shall have an allowed superpriority administrative expense claim with priority over any and all administrative expenses of the Debtor. Ipsen shall receive the following adequate protection on its prepetition loan agreements: administrative expense priority status; replacement liens on postpetition assets to the extent of any diminution in value of any prepetition collateral and the use of cash collateral, junior only to the liens on account of the DIP Loan.

**506(c) waiver:** The Debtor will not assert any surcharge under Section 506(c) of the Bankruptcy Code with respect to Ipsen's prepetition liens.

**Automatic Stay:** Granting Ipsen relief from the automatic stay without further order of Court upon an event of default, subject to the right of the Debtor to challenge the occurrence of an event of default by requesting a hearing upon three (3) business days' written notice to Ipsen, in which case pending the Bankruptcy Court hearing Ipsen will refrain from exercising its remedies with respect to the collateral.

**Release:** The Debtor is acknowledging its obligation to Ipsen and the validity of Ipsen's security interests in the assets of the Debtor. The agreement, however, preserves, subject to the entry of the Bid Procedures Order and the Release contained therein, a sixty (60) day window of any Committee to investigate the validity and enforceability of the Ipsen debt and security interest.

**Payment:** The DIP Credit Facility contemplates payments from the sale of the Debtor's assets. The DIP financing provides that upon a sale, the proceeds will be disbursed first to the payment of administrative expenses and expenses related to the sale, then to repay the DIP Credit Facility, then the balance will be shared among Ipsen, the Debtor, creditors, and shareholders.

13

34. Given that the Debtor's Products are still in the clinical stage of development and the Debtor has no operating revenues, it would be very difficult for the Debtor to secure alternative financing on a junior basis to Ipsen's prepetition secured indebtedness, and Ipsen will not consent to a loan that primes its existing liens. The Debtor made efforts to secure alternative financing prior to the Petition Date and was unable to obtain financing on either an unsecured or junior secured basis.

35. Ipsen has agreed to provide essential financing to maintain operations pending an orderly sale of assets and to contribute assets of Ipsen relating to the Products as part of the sale package. Ipsen has further agreed to provide for an opportunity for unsecured creditors and equityholders to participate in the sale proceeds, even if the proceeds are insufficient to pay Ipsen's secured indebtedness in full. Ipsen's contribution to the reorganization process is significant and its extension of credit to the Debtor is made in good faith.

36. Good cause exists for approval of the DIP Credit Facility.

**B.    Motion to Authorize Severance Plan and KEIP.**

37. The Debtor's employees are necessary to continue its operations and to effectuate a smooth and orderly reorganization. The Debtor's employees have knowledge and skill essential to the Debtor's continued operation that would be difficult and costly to replace. The Debtor has therefore requested approval of a severance program (the "Severance Plan") and a key employee incentive plan (the "KEIP") to ensure that its highly skilled and essential employees are incentivized to remain with the Debtor through the sale process (the "Severance Motion"). The terms of the Severance Plan and KEIP are as follows:

14

### I. Severance Plan

38. As is more fully set forth in the Severance Motion, the proposed Severance Plan would provide severance as follows:

39. Eligible Employees (as defined below) would be paid severance equal to three (3) months' salary per employee.

40. In order to be eligible for the Severance Plan (an "Eligible Employee"), an employee must: (a) not be discharged for cause, as defined herein, (b) not voluntarily terminate their employment; (c) not accept an offer of employment with any acquirer of the Debtor's assets or, if such an offer is accepted, must not be terminated by the acquirer within 12 months of the commencement of employment; and (d) execute a general release of claims against the Debtor, its officers, directors and affiliates, including any claims arising under existing employment or severance agreements.

41. For the purposes of the Severance Plan, termination "with cause" shall mean termination based upon the gross negligence or willful misconduct of the employee.

42. The total cost of the Severance Plan for all of the Debtor's employees is approximately $910,000. Under the Severance Plan, the mean severance payment that would be made to the Debtor's management employees would be approximately $69,700 and the mean severance payment to nonmanagement employees would be approximately $38,000. The mean severance payment made in calendar year 2012 to nonmanagement personnel terminated prepetition was approximately $12,800.

### II. KEIP Plan

43. The KEIP is a performance-based incentive plan. Each of the Debtor's employees will be allowed to participate. It provides for potential performance bonuses if earned

as a result of one or more successful asset sales ("Sale Transaction(s)") at specified levels. The KEIP has a potential cost of between $1,820,000 and $3,960,000, payable from the proceeds of sale. The following is a description of the KEIP.

44. In the event that a Sale Transaction(s) is consummated having a minimum upfront cash component of at least $40,000,000, then in such event all employees shall be entitled to a bonus of fifty percent (50%) of each individual's annual salary.

45. In the event a Sale Transaction(s) is consummated having a minimum upfront cash component of at least $75,000,000, then in such event the nine (9) most senior employees shall be entitled to a bonus equal to one hundred and twenty-five percent (125%) of each individual's annual salary, and the remaining nine (9) employees shall be entitled to a bonus equal to seventy-five percent (75%) of each individual's annual salary.

46. Bonus payments shall be payable as an administrative expense out of the proceeds of a Sale Transaction(s).

### C.  Application to Retain Chief Restructuring Officer

47. Ipsen has required, as a condition to its willingness to fund under the DIP Credit Facility, that the Debtor retain a Chief Restructuring Officer to monitor the sale process, the Debtor's operations and financial reporting pending any such sale. The Debtor has agreed to retain Michael Nowlan and Mark Weinsten of FTI Consulting, Inc. (collectively, "FTI") as co-chief restructuring officers to perform this service, subject to the approval of this Court. The essential terms of FTI's retention are as follows:

48. The Retention Agreement provides, among other things, upon approval of the Court that:

   a. <u>Staffing</u>. Weinsten and Nowlan will serve jointly as chief restructuring officers ("CROs") of the Debtor reporting to and subject to the supervision of

16

the Debtor's Chief Executive Officer and Board. In addition to the CROs, after prior consent of the Debtor's Chief Executive Officer, FTI may provide to the Debtor additional staff (the "Temporary Hourly Staff").

b. <u>Services</u>. FTI shall provide restructuring and turnaround services to the Debtor in the Chapter 11 proceeding including, without limitation, services related to:

   i. Budgeting and related reporting requirements;

   ii. Vendor relationship management;

   iii. Restructuring support;

   iv. Testimony before the Court, as necessary;

   v. Development of employee-related plans; and

   vi. General Chapter 11 services, including preparation of required monthly operating reports.

c. <u>Compensation</u>. As compensation for the services of the CROs, the Debtor shall pay to FTI a monthly fee in the amount of $75,000 (the "Monthly Fee"), which fee is discounted from FTI's normally hourly fees. The Monthly Fee is based upon upon FTI's commitment that the CROs will provide no less than 100 hours per month (or pro rata share therof) in connection with the tasks specified above. In addition to the Monthly Fee, any Hourly Temporary Staff will charge their current hourly rates ("Hourly Fees"), to be paid in accordance with procedures governing interim compensation to professional persons. FTI's current hourly rates are as follows:

   i. Senior managing directors: $780-$895/hour;

   ii. Directors and managing directors: $560-$745/hour; and

   iii. Consultants and senior consultants: $280-530/hour.

d. <u>Completion Fee</u>. If, during the term of the Retention Agreement within six (6) months following its termination: (i) the Court confirms, by final non-appealable order, a plan of reorganization by the Debtor or (ii) the Debtor consummates a sale of all or substantially all of its assets, FTI will be entitled to a completion fee in the amount of $150,000, and may be entitled to an additional fee of $150,000, in the reasonable discretion of the Board (the "Completion Fee"), all subject to Bankruptcy Court approval.

e. <u>Term</u>. The Retention Agreement may be terminated by the Debtor upon thirty (30) days notice to FTI. FTI may terminate the Retention Agreement upon certain enumerated events.

17

49. The retention of FTI will provide additional support for the Debtor's reorganization and sale process and will provide a high level of skill and knowledge of bankruptcy practice, financial reporting, and Chapter 11 operations. As noted, FTI's engagement was necessary to secure the support of Ipsen to finance the sale process, without which the Debtor could face the prospect of a disorderly liquidation, which would severely depress asset value and likely generate no recovery for any party other than Ipsen.

### D. Motion for Authority to Pay Employee Benefits

50. As part of its first day relief, the Debtor has filed a motion requesting authority to pay certain employee wages and benefits in the ordinary course of business, including amounts accrued prior to the Petition Date. Shortly prior to the filing, the Debtor issued its biweekly payroll for services rendered through October 31, 2012 and therefore no authority is sought to pay wages earned immediately prior to the filing. The Debtor has requested authority to honor accrued vacation for its remaining employees in the ordinary course of business, to pay any accrued and unpaid vacation wages upon termination of an employee, and to pay any other employee benefit payments in the ordinary course of business.

### E. Application to Retain Murphy & King, P.C.

51. The Debtor will require the retention of experienced bankruptcy counsel to navigate it through the Chapter 11 process. Accordingly, the Debtor intends to file an application for authority to retain Murphy & King, P.C. as its general bankruptcy counsel.

## VI. ADDITIONAL MOTIONS AND REQUESTED RELIEF

52. In addition to the foregoing pleadings which are being filed simultaneously herewith, the Debtor contemplates filing several additional pleadings in the coming days. A brief description of these pleadings and the relief that will be requested are set forth below:

### A. Application to Retain Investment Banker

53. In order to maximize the recovery from the sale of the assets of the Debtor and Ipsen, the Debtor has determined that retention of an investment banker is necessary and desirable. The Debtor is actively negotiating terms of retention with Evercore Group, LLC ("Evercore") and anticipates filing an application for authority to retain Evercore as its investment banker in the next few days.

### B. Motion to Establish Fee Payment Procedures

54. In Chapter 11 cases of this size and type, it is customary to establish procedures for the payment of interim compensation to professional persons. In fact, Appendix 6 to the Massachusetts Local Bankruptcy Rules provides for proposed Case Management Procedures, including provisions governing payments to professionals. The Debtor intends to file a motion, consistent with Appendix 6, to establish such procedures in this case in order to provide greater predictability to the budgeting process and to ensure timely payment of fees to retained professionals.

### C. Motion to Establish Bid Procedures and Motion to Sell Assets

55. The Debtor intends to file a motion (the "Bid Procedure Motion") requesting approval of procedures relating to the marketing and sale of the Debtor's assets, including the establishment of bid deadlines, hearing dates, and procedures for becoming a qualified bidder. The Debtor also intends to seek approval of a waterfall respecting the allocation and distribution of sale proceeds that will afford other parties with an opportunity to participate in the recovery from a sale. Ipsen's agreement to contribute its Product-related assets to the sale process and its agreement to provide for a recovery for other constituencies is integral to the contemplated sale

19

process. The Debtor also intends to file a motion authorizing the sale of the assets consistent with the Bid Procedure Motion.

### D. Motion to Amend Contract with CMC

56. The Debtor also intends to file a motion to approve certain arrangements respecting its business relationship with CMC, which will address among other things the treatment of CMC's cure claims and the terms for CMC's performance of services during the course of the case.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Attested to this 30th day of October, 2012.

_____
John P. Butler, Chief Executive Officer

637248